FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Sep 02, 2026

SEAN F. MCAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| JEREMY P.,[1]<br><br>Plaintiff,<br><br>v.<br><br>FRANK BISIGNANO,<br>Commissioner of Social Security,<br><br>Defendant. | No. 1:26-cv-3035-EFS<br><br>**ORDER AFFIRMING THE ALJ'S DENIAL OF BENEFITS** |

Plaintiff Jeremy P. asks the Court to reverse the Administrative Law Judge's (ALJ) denial of Title 2 and Title 16 benefits. Substantial evidence supports the ALJ's reasons for discounting Plaintiff's

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

testimony of disability, weighing of the conflicting medical opinions, and crafted RFC, which included both exertional and non-exertional limitations. For the reasons that follow, the ALJ's decision is affirmed.

## I. Background

Plaintiff filed his Titles 2 and 16 applications for benefits in May 2021, alleging disability beginning March 19, 2021.[2] Following a hearing, an ALJ issued a decision finding him not disabled in April 2024, which the Appeals Council reversed and remanded for further proceedings in March 2025.[3]

On remand, Plaintiff appeared for a hearing before a new ALJ, S. Pines, in August 2025, at which Plaintiff and a vocational expert testified.[4] Following the hearing, the ALJ issued a decision finding Plaintiff not disabled.[5] The ALJ found Plaintiff's alleged symptoms

---

[2] Administrative Record (AR) 420, 423, 427.

[3] AR 79–121, 192–210, 218–19.

[4] AR 122–45.

[5] AR 14–38. Per 20 C.F.R. §§ 404.1520(a)–(g), 416.920(a)–(g), a five-step evaluation determines whether a claimant is disabled.

were inconsistent with the medical evidence and other evidence.[6] The ALJ considered 12 prior administrative medical findings and medical opinions.[7] As to the sequential disability analysis, the ALJ found:

- Plaintiff met the insured status requirements through December 31, 2023.
- Step one: Plaintiff had not engaged in substantial gainful activity since March 19, 2021, the alleged onset date.
- Step two: Plaintiff had the following medically determinable severe impairments: degenerative disc disease of the cervical and lumbar spine; osteoarthritis of the left shoulder and left foot; diabetes with diabetic polyneuropathy; anxiety disorder; depressive disorder; trauma disorder; and substance use disorder.
- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

---

[6] AR 26.

[7] AR 32–36.

- RFC: Plaintiff had the RFC to perform light work with the following exceptions:

  The claimant can stand and walk for six hours and sit for six hours in an eight-hour workday. The claimant can occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds. The claimant can occasionally balance and stoop, but never kneel, crouch, and crawl. The claimant can occasionally reach overhead, and frequently reach in all other directions. The claimant can frequently handle, finger, and feel. The claimant can have occasional exposure to extreme temperatures, vibration, pulmonary irritants, and hazards. The claimant can understand, remember, and carry out simple instructions and can use judgment to make simple work related decisions. The claimant can deal with occasional changes in a routine work setting. The claimant can occasionally interact with coworkers, with no collaborative work. The claimant can occasionally interact with the public.

- Step four: Plaintiff was not capable of performing past relevant work.

- Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as retail trade marker, routine clerk, and router.[8]

---

[8] AR 21–38.

The Appeals Council denied Plaintiff's request to review the ALJ's decision.[9] Plaintiff now appeals to district court.[10]

## II. Standard of Review

When considering the ALJ's findings, the court is constrained to the reasons and supporting explanation offered by the ALJ.[11] The ALJ's decision is reversed "only if it is not supported by substantial evidence or is based on legal error"[12] and such error impacted the nondisability determination.[13] Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant

---

[9] AR 1.

[10] ECF No. 1.

[11] *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014).

[12] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. § 405(g).

[13] *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012), *superseded on other grounds by* 20 C.F.R. § 416.920(a) (recognizing that the court may not reverse an ALJ decision due to a harmless error—one that "is inconsequential to the ultimate nondisability determination").

evidence as a reasonable mind might accept as adequate to support a conclusion."[14]

## III. Analysis

Plaintiff argues the ALJ erred in evaluating his testimony and the medical opinions. The Commissioner argues the ALJ committed no reversible legal error, and substantial evidence supports the decision. As is explained below, Plaintiff fails to establish consequential error.

---

[14] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). *See also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

**A. Symptom Reports: Plaintiff fails to establish consequential error.**

The ALJ found Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record. Plaintiff argues the ALJ failed to provide valid reasons for discounting his physical and mental symptom reports. As is discussed below, the ALJ's reasons for discounting Plaintiff's symptoms are clear and convincing reasons supported by substantial evidence.

1. Standard

After finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work.[15] Factors the ALJ may consider when evaluating the intensity, persistence, and limiting effects of a claimant's symptoms include: (1) objective medical evidence; (2) daily activities; (3) the location, duration, frequency, and intensity of pain or other symptoms; (4) factors that precipitate and

[15] 20 C.F.R. §§ 404.1529(c), 416.929(c).

aggravate the symptoms; (5) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (6) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; and (7) any non-treatment measures the claimant uses or has used to relieve pain or other symptoms.[16]

If the ALJ finds inconsistency between the claimant's reported symptoms and the evidence, the ALJ must identify what symptom claims are being discounted and clearly and convincingly explain the rationale for discounting the symptoms with supporting citation to evidence.[17] This requires the ALJ to "show his work" and provide a

---

[16] *Id.* §§ 404.1529(c)(2), (3), 416.929(c)(2), (3). *See also* 3 Soc. Sec. Law & Prac. § 36:25, Consideration of objective medical evidence (2025).

[17] *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022); 20 C.F.R. §§ 404.1529(c), 416.929(c); *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014); Soc. Sec. Rlg. (SSR) 16-3p, 2016 WL 1119029, at *7.

"rationale . . . clear enough that it has the power to convince" the reviewing court.[18]

While an ALJ may not "reject a claimant's subjective complaints based *solely* on lack of medical evidence to *fully corroborate* the alleged severity of pain," the ALJ may discount subjective complaints that are *inconsistent* with the objective medical evidence, so long as the ALJ explains why the objective medical findings are inconsistent with the claimant's complaints.[19] Inconsistencies between the objective medical evidence and the claimant's pain testimony cannot, on their own, constitute a specific and convincing reason to discredit pain testimony.[20] "Because pain is a subjective phenomenon . . . it is possible to suffer disabling pain even where the *degree* of pain, as opposed to the mere *existence* of pain, is unsupported by objective medical

---

[18] *Smartt*, 53 F.4th at 499 (alteration added).

[19] *Id.* (quoting *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005)) (emphasis added in *Smartt*).

[20] *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989).

findings."[21] Therefore, "[o]nce a claimant submits objective medical evidence establishing an impairment that could reasonably be expected to cause *some* pain, it is improper as a matter of law for an ALJ to discredit excess pain testimony solely on the grounds that it is not fully corroborated by objective medical findings."[22]

Additionally, the ALJ "may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record" if "the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms."[23] Further, the ALJ may discount a claimant's reported disabling symptoms if he can spend a substantial part of the day engaged in pursuits inconsistent with the reported disabling symptoms or involving the performing of

---

[21] *Id.*

[22] *Id.* (cleaned up).

[23] SSR 16-3p, 2016 WL 1119029, at *8.

work-related functions.[24] However, the ALJ must consider whether the nature of the activities allows for frequent breaks that would be inconsistent with maintaining a daily work schedule and also should not penalize the claimant for attempting to engage in normal life activities.[25]

Further, a claimant's course of treatment, including an inadequately explained failure to seek or comply with treatment, is a relevant factor for the ALJ to consider when assessing the claimant's symptom reports.[26] In doing so, the ALJ must discuss whether the

---

[24] *Molina*, 674 F.3d at 1113.

[25] *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014); *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). *See also Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) (The Ninth Circuit has "repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability.").

[26] 20 C.F.R. §§ 404.1529(c)(3), 404.1530, 416.929(c)(3), 416.930.

claimant had good cause for not seeking treatment, including whether the mental impairment contributed to him not seeking rehabilitation.[27]

Finally, an ALJ may discount a claimant's symptom reports based on inconsistent statements and a tendency to exaggerate or engage in conduct to manipulate the disability-determination process.[28]

---

[27] *See id.* §§ 404.1530(c), 416.930(c) ("We will consider your physical, mental, educational, and linguistic limitations . . . when determining if you have an acceptable reason for failure to follow prescribed treatment."); *Garrison*, 759 F.3d at 1018 n.24 (holding an ALJ may not reject a claimant's symptom testimony based on a lack of treatment if "the record affords compelling reason to view such departures from prescribed treatment as part of claimants' underlying mental afflictions"); *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1209–300 (9th Cir. 1999) ("[I]t is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation."); SSR 16-3p, 2016 WL 1119029, at *8.

[28] *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) (The ALJ may consider

However, that a claimant pursues medical treatment to bolster his disability benefits application is not by itself a sufficient reason to discredit the claimant's testimony.[29]

2. Plaintiff's Testimony

Plaintiff testified to his living circumstances and reported disabling physical and mental limitations at two hearings, and described his limitations further in function reports.[30] He had a private residence via State housing benefits, but was homeless before.[31] He

---

"ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid.").

[29] *See Cha Yang v. Comm'r of Soc. Sec. Admin.*, 488 F. App'x 203, 205 (9th Cir. 2012) (unpublished) ("If a petitioner's desire or expectation of obtaining benefits were by itself sufficient to discredit a claimant's testimony, then no claimant would ever be found credible.") (citing *Berry v. Astrue*, 622 F.3d 1228, 1235 (9th Cir. 2010)).

[30] AR 79–121, 122–45, 491–99, 519–26.

[31] AR 86.

said that when his wife used to live with him, she took care of him by, for example, grocery shopping, which he avoided due to social anxiety, and helping him out of bed most days, which he could not do by himself because of chronic pain.[32] His last job was installing drywall and related work, which he stated he had to give up because he was missing too many days of work due to his ailments.[33] He said he tried other jobs where he was mostly sitting or driving a forklift, but he had to leave because of pain.[34] He stated he missed 51 days of work during his last 6 months of employment due to pain and anxiety.[35]

Plaintiff testified to several severe musculoskeletal impairments. First, he stated that his left foot needed surgery, so he reportedly could not stand for more than 15 to 20 minutes and had to be off his feet for 3 to 4 hours each day.[36] He could not have the foot surgery because he

---

[32] AR 87, 100, 492.

[33] AR 86, 92.

[34] AR 96, 98.

[35] AR 132, 134.

[36] AR 87.

could not afford the diabetic diet necessary to reduce his A1C.[37] His left leg also experienced restless leg and twitching.[38] He stated he had pain and spasms in his left shoulder preventing him from raising his arms above his head.[39] He said that he also suffered from chronic back pain, requiring him to lay down periodically throughout the day and which kept him "down for weeks at a time."[40] He recounted several episodes of collapsing and not being able to get up for long periods of time.[41]

Because of his musculoskeletal impairments, he testified that he needed to lay down during the day when his sedentary hobbies became too painful,[42] and that he could hardly walk most days.[43] He also stated that he could not sit, stand, squat, or use his left arm at work, sleep for

---

[37] AR 90.

[38] AR 102–03.

[39] AR 88, 102.

[40] AR 87, 491.

[41] AR 87, 89, 95, 99, 105–06, 133, 499.

[42] AR 99.

[43] AR 491.

only two hours at a time, and do minor household chores only for ten to twenty minutes, then he had to rest for more than an hour.[44] He reported he was unable to do any work activities except for following instructions, could walk up to two blocks before needing to stop and rest, could not prepare his own meals, and took twice as long to do yard work because of pain and needing frequent breaks.[45]

Plaintiff tried physical therapy multiple times for his back and shoulders, which he reported did not help.[46] He needed MRIs but he said his medical insurance would not approve them.[47]

Plaintiff had diabetes, which caused neuropathy and painful swelling in his hands.[48] He stated that every day he woke up with his hands so swollen that he could not close them.[49] He also reported that

---

[44] AR 491–93.

[45] AR 497, 519–21, 524.

[46] AR 90.

[47] AR 88.

[48] AR 101–04.

[49] AR 101, 130.

he could not wash dishes for more than ten minutes at a time because of swelling and pain in his hands.[50]

As to mental impairments, Plaintiff said he preferred being alone because of anxiety.[51] He went grocery shopping twice a month when there were few people in the store, and he would leave if there were more than a few cars in the parking lot.[52] He had few social activities because he did not like being around people.[53] He stated that he got angry very easily and could not handle changes in routine.[54]

3. ALJ's Reasons

The ALJ summarized Plaintiff's testimony from the two hearings and found Plaintiff's statements concerning the intensity, persistence, and limiting effects of his "medically determinable impairments"

---

[50] AR 130.

[51] AR 131.

[52] AR 131, 522.

[53] AR 496, 523.

[54] AR 498, 525.

inconsistent with the objective medical evidence.[55] The ALJ credited some of Plaintiff's testimony with support in the record, but found him no more limited than as provided in the RFC.[56]

As to Plaintiff's musculoskeletal impairments, the ALJ found that imaging of Plaintiff's left foot, spine, and left shoulder did not support Plaintiff's testimony of completely disabling pain in those areas.[57] The ALJ also noted Plaintiff's "conservative" treatment for musculoskeletal complaints, primarily consisting of following up with primary care and taking NSAID medications, with no surgeries or treatment from back or shoulder specialists.[58] The ALJ acknowledged that Plaintiff had visited a podiatrist for foot pain, who noted physical injuries but recommended conservative treatment, and would not perform elective surgery on his foot until his A1C was below 7% and he quit smoking.[59]

---

[55] AR 25–26.

[56] AR 26–32.

[57] AR 27.

[58] AR 27.

[59] AR 27.

Plaintiff had also sought emergency treatment once for back pain radiating down his leg, but was treated without hospital admission.[60] The ALJ then noted normal physical findings throughout the record, such as normal neurological and musculoskeletal exams except for an occasionally antalgic gait, minimal left shoulder crepitus, and reduced range of motion in the spine and left shoulder.[61]

As to Plaintiff's diabetes, the ALJ found Plaintiff was treated with medication, and although the record contained two notations of diabetic neuropathy, there were no nerve conduction studies or loss of sensation on neurologic testing.[62] There was also no evidence of diabetic ketoacidosis.[63] The ALJ found Plaintiff was noncompliant in taking his medication, checking blood sugar, and following a diabetic diet.[64] The ALJ found the results of two consultative exams

---

[60] AR 27.

[61] AR 27–28.

[62] AR 28.

[63] AR 28.

[64] AR 28.

contradicted the severity of Plaintiff's testimony about his hand pain and swelling.[65] Based on his testimony and the objective diabetes-symptom evidence, the ALJ limited the RFC to occasional exposure to hazards and frequent handling, fingering, and feeling.[66]

As to mental impairments, the ALJ found the record contained evidence of conservative treatment with medication and therapy.[67] The ALJ acknowledged some abnormal mental status examination findings, but on balance there were more normal findings.[68] The ALJ considered that Plaintiff went to the hospital twice for mental health reasons; during the first, he was deemed safe to go home, and during the second, providers determined his symptoms were caused by methamphetamine use.[69] The ALJ credited the evidence from several psychological consultative examinations and limited Plaintiff's RFC to

---

[65] AR 28–29.

[66] AR 29.

[67] AR 29.

[68] AR 29.

[69] AR 29.

simple tasks, occasional changes, occasional interactions with others, and no collaboration.[70]

The ALJ also relied on Plaintiff's daily activities, noting inconsistencies between his testimony and the record.[71] For example, Plaintiff lived in a one-person cabin, and as part of his agreement with the State housing benefit, his wife could not come onto the property, indicating he could take care of himself and live independently.[72]

Finally, the ALJ considered Plaintiff's failure to obtain prescribed treatment.[73] The ALJ found Plaintiff was required to pursue physical therapy before insurance would pay for an MRI, but Plaintiff refused to participate.[74] The ALJ also noted instances in the record where

---

[70] AR 30–31.

[71] AR 31.

[72] AR 31.

[73] AR 31–32.

[74] AR 31.

Plaintiff reported to medical providers he was seeking treatment only to support his disability claim.[75]

4. Analysis

On this record, substantial evidence supports the ALJ's reasons for discounting the severity of Plaintiff's testimony and limiting him to the crafted RFC. The ALJ rationally relied on objective medical evidence, arguably conservative treatment, Plaintiff's activities of daily living, his refusal to engage in recommended treatment, and his potential motivations as evidence that undercut Plaintiff's testimony of completely disabling physical and mental impairments.

Starting with the musculoskeletal medical evidence, x-rays of Plaintiff's left foot in October 2021 showed no acute injury but mild degenerative changes at two joints.[76] X-rays of the left foot from July 2023 showed no acute findings, and bones/joints and soft tissues were normal.[77] X-rays of the spine from October 2021 and March 2023

---

[75] AR 31–32.

[76] AR 1157.

[77] AR 1250.

showed only mild to moderate degenerative changes, and x-rays from May 2022 had no acute findings, with normal bones/joints, normal alignment, and unremarkable soft tissue.[78] An x-ray from May 2025, however, showed sacralization of L5 with "underlying suspected bilateral pseudoarticulation which can be a source of chronic low back pain."[79] X-rays of the left shoulder from October 2021 showed only a slightly depressed acromion, which was "probably a normal variation or low grade separation."[80] X-rays of the left shoulder from March 2023 showed only mild degenerative changes of a joint.[81]

The ALJ reasonably determined that the totality of imaging did not support the severity of Plaintiff's reported limitations, which included the inability to raise his left arm, the need to lay down most days, and the need to take frequent breaks. The musculoskeletal

---

[78] AR 776, 1158, 1386.

[79] AR 1676.

[80] AR 1159.

[81] AR 1387.

images did not reveal acute findings to support the severity of Plaintiff's testimony.

The ALJ also rationally weighed the normal and abnormal findings on physical exams throughout the record.[82] As the ALJ noted, medical providers and examiners noted an antalgic gait, crepitus in the left shoulder, and reduced ranges of motion in his left toe, left shoulder, and neck on several occasions throughout the relevant time.[83] The ALJ also considered, however, that those same and several other physical exams had normal findings. The ALJ correctly determined that examiners throughout the relevant period did not observe Plaintiff to have objective signs consistent with the severity of his testimony: he presented with normal range of motion in a majority of extremities in October 2021, April 2022, June 2022, January 2023, July 2023, and May 2025;[84] normal muscle sensation, strength, and tone, except for tenderness in one left toe, in October 2021, June 2022, January 2023,

---

[82] *See* AR 27–28.

[83] AR 662, 788, 795, 835, 1031, 1123–24, 1144–45, 1250, 1310–11.

[84] AR 788, 794–95, 834, 1123–24, 1311, 1430.

and August 2023;[85] normal gait in June 2022 and January 2023;[86] and no atrophy at any point. Based on these objective signs, the ALJ determined, with substantial evidence in support, that the record supported some but not all of Plaintiff's pain testimony, and accordingly limited him to a reduced range of light work.[87]

Next, the ALJ reasonably characterized Plaintiff's musculoskeletal treatment as "conservative."[88] There is no evidence that Plaintiff had surgery, took narcotic painkillers long-term, or required an assistive walking device, and his providers described the

---

[85] AR 788, 834, 1250.

[86] AR 835, 1124.

[87] AR 25, 28.

[88] *See* AR 27; *see also Garrison*, 759 F.3d at 1015 n.20 (doubting whether the epidural steroid shots, which did not offer sustained pain relief notwithstanding also physical therapy and prescribed pain pills taken several times a day, constituted conservative medical treatment for the claimant's continued neck and back pain).

measures he did take as conservative.[89] Plaintiff could have had surgery to treat the plantar plate rupture in his left toe, but the podiatrist refused to perform what she called "elective" surgery until his A1C was below 7% and he quit smoking.[90] There is no evidence that Plaintiff followed up for possible surgery, but his A1C remained too high and he was still smoking at follow-up later in the year.[91] Additionally, Plaintiff once visited the emergency department in June 2025 for back pain radiating down into his leg.[92] However, he was discharged after routine testing and being given pain medication.[93] Crucially, the ALJ considered all this evidence—i.e., evidence

---

[89] *See, e.g.*, AR 1248. *Cf.* AR 1180, 1220 (prescribing narcotic painkillers for a set period of time); AR 614 (administering NSAID medication by injection); AR 1248 (directing that Plaintiff wear pads and sleeves for his feet).

[90] AR 1248.

[91] AR 1080, 1109.

[92] AR 1610.

[93] AR 1616–20.

supporting and cutting against disability—in rationally determining that the record overall reflected more conservative treatment that did not support the severity of Plaintiff's testimony.

The ALJ also reasonably discounted Plaintiff's testimony that medical insurance prevented him from receiving MRIs of his musculoskeletal systems.[94] The record showed that medical insurance would pay for the MRIs only after Plaintiff underwent physical therapy,[95] but Plaintiff declined physical therapy.[96] Plaintiff argues on appeal, as he did to his primary provider, that he had good cause to refuse physical therapy because it did not help in the past.[97] The argument is meritless because there is no objective or opinion evidence in the record supporting the futility of physical therapy, and the several physical-therapy referrals in the record indicate that the physical-therapy requirement was reasonable medical advice.

---

[94] *See* AR 31.

[95] *E.g.*, AR 1809.

[96] *E.g.*, AR 1807, 1205.

[97] *See* AR 1807, 1205.

As to the severity of Plaintiff's diabetes symptoms, the ALJ rationally weighed the evidence supporting and discounting Plaintiff's testimony. As the ALJ noted, the record supported Plaintiff's testimony of experiencing severe symptoms when he had dangerously high or low blood sugar, such as fatigue, dizziness, palpitations, syncope, and at least two instances of neuropathy presenting as numbness in his extremities.[98] So the ALJ reasonably limited him to occasional exposure to hazards and frequent handling/fingering/feeling.[99]

Substantial evidence supports the ALJ's decision to not further limit Plaintiff's ability to handle/finger/feel based on his testimony that he could not grip anything with his hands due to severe swelling. The record contains no instances of Plaintiff being unable to make a fist, and Plaintiff could make a full fist and grasp and manipulate objects with his fingers at consultative examinations in June 2022 and January 2023.[100] Substantial evidence supports not limiting the RFC

---

[98] AR 833, 1107, 1192, 1610.

[99] AR 29.

[100] AR 835, 1123.

further because no objective tests confirmed his neuropathy; there was no evidence of diabetic ketoacidosis; he managed his diabetes with medication; he did not require an endocrinologist; and there was evidence tending to show his poor compliance with managing his blood sugar. His A1C level was always high, he visited the emergency department in October 2021 for high blood sugar after he did not diligently check his blood sugar, and he admitted to not complying with a diabetic diet.[101]

On appeal, Plaintiff argues the ALJ erroneously did not consider the economic barriers to eating a diabetic diet and that his memory impairments prevented him from checking his blood sugar. Plaintiff points to no evidence in the record from which the Court could decide that Plaintiff's finances made eating a diabetic diet truly impossible. To the extent the ALJ erred by not considering whether Plaintiff's memory impairments prevented him from checking his blood sugar, any error was harmless because the ALJ minimally relied on Plaintiff not regularly checking his blood sugar. The October 2021 emergency

---

[101] *See, e.g.*, AR 798.

department visit was the only visit clearly resulting from Plaintiff's failure to check his blood sugar;[102] the July 2021 emergency department visit came after his blood sugar gradually climbed over the prior two and a half weeks;[103] and there were no other hospital visits for high blood sugar. In any event, the ALJ limited Plaintiff's RFC to account for the dangers of blood sugar spikes.

As to mental impairments, the ALJ considered evidence supporting and cutting against disability, and substantial evidence supports the extent to which the ALJ discounted the severity of Plaintiff's testimony and limited the RFC. The ALJ noted several abnormal mental status findings in the record, accurately reporting instances of impaired affect, thought process, insight and judgment, memory, concentration, and mood.[104] The ALJ also noted several normal mental status findings, accurately reporting instances of

---

[102] *See* AR 798, 801–02.

[103] AR 819.

[104] AR 29 (citing AR 597, 605, 662, 680, 695, 779, 800, 874) (ALJ's erroneous page-number citations reconciled).

normal thought process, attention, fund of knowledge, insight and judgment, behavior, memory, eye contact, and concentration.[105] These findings were primarily noted by either mental health care providers or at primary care visits for purposes of mental health, and thus are reliable and relevant to Plaintiff's mental functioning.

The ALJ also reasonably considered the evidence of Plaintiff's two emergency department visits for mental health. He visited the emergency department in July 2023 for depression and suicidal ideation.[106] He presented alert in no acute distress, with depressed mood, good insight, and no delusions or hallucinations.[107] He was discharged without any changes to his medication and instructed to follow up with his mental health providers.[108] He visited the emergency department again in May 2025 after he fainted when he attempted to

---

[105] AR 29 (citing AR 597, 605, 608, 652, 662, 680, 695, 728, 732, 874, 1037, 1254, 1258) (ALJ's erroneous page-number citations reconciled).

[106] AR 1183.

[107] AR 1185.

[108] AR 1186–87.

walk home after his truck broke down and thought he was having a panic attack, which testing led the provider to believe was caused by exhaustion and methamphetamine use.[109]

The ALJ also weighed the normal and abnormal mental-health findings with several psychological/psychiatric examinations. First, Plaintiff underwent a psychiatric evaluation with a treating provider, Jeffry Jacobs, MD, in May 2021, and as the ALJ noted, he presented with several abnormal signs: he was then using alcohol and methamphetamine; he had symptoms of long-term anxiety and depression; he had poor concentration and memory; he struggled to comply with regularly taking his Zoloft and when he missed a dose he became angry and irritable; he was disorganized, rambling, and tangential with the need for redirection; and he was fixated on his physical-health symptoms and could not be redirected away.[110] Dr. Jacobs reached the following conclusion:

> The only clear-cut diagnoses are multiple substance use disorders, all of which are active, including alcohol use

---

[109] AR 1413, 1419–26.

[110] AR 603–05.

> disorder; cannabis use disorder; and methamphetamine use disorder. Potential psychiatric conditions for which []he meets criteria and, if it turns out they are not precipitated by substance use, would include major depressive disorder, and a [wide] spectrum of anxiety disorder symptoms with obsessive-compulsive symptoms, generalized anxiety, social anxiety, and symptoms of PTSD.[111]

Dr. Jacobs recommended substance use treatment and adhering to the Zoloft regimen, and he prescribed hydroxyzine for anxiety.[112]

Second, Plaintiff underwent a psychological consultative examination with Emma Joan Billings, PhD, in June 2022.[113] The ALJ reasonably considered Dr. Billings' normal and abnormal findings:

> On exam, the claimant was casually dressed and he sat in a somewhat slumped posture with frequent changes of position and fidgeting. He was "highly talkative" and cooperative. He made good eye contact and was generally cooperative throughout the assessment. He spoke in a clear manner without articulation errors. He described himself as being in a "blank mood" and his affect appeared broad. The claimant could recall the name of one out of three objects following an eight-minute delay. He refused to try to perform serial sevens. He could spell the word "world" forward and backward without problem. His score on the Digit Span Task placed him in the 2nd percentile. He could

---

[111] AR 605.

[112] AR 605.

[113] AR 843–49.

> recall one presentation of five digits forward and one presentation of three digits backward. He could correctly sequence both presentations of three digits. The claimant's general information was in the average range. He could not recall any recent news event. He did not know the name of the governor of Washington. His judgment for safety questions was appropriate. His interpretation of proverbs was concrete. He had no difficulty completing a three-state command and he was fully oriented.
>
> On the WAIS-IV, the claimant was extremely distracted and lacked attention. Dr. Billings felt that the testing results were reflective of the claimant's pain and discomfort and she felt the overall testing results might be an underestimate of the claimant's full intellectual ability. The claimant's full-scale IQ was 84, which is in the low average range. The claimant's working memory index was 69, in the extremely low range. His processing speed was 76, in the borderline range. Dr. Billings felt the claimant appeared to have lapses of attention and concentration intermittently throughout the session.[114]

The ALJ's impression of Dr. Billings' examination is accurate and contributes to the substantial evidence to find Plaintiff no more mentally limited than as provided in the RFC.[115]

---

[114] AR 30.

[115] *See* AR 843–49.

Third, Plaintiff underwent a psychiatric consultative examination with Emily Ketchel, PMHNP, in December 2022.[116] The ALJ reasonably considered NP Ketchel's normal and abnormal findings:

> PMHNP Ketchel noted the claimant drove himself to the exam, and the claimant's behavior was unremarkable. On exam, the claimant was appropriately dressed but poorly groomed. His cooperation and effort were good, and eye contact and interpersonal confidence was fair. The claimant was restless, fidgeting, and constantly moving in his chair. His speech was normal and soft. His mood was "nervous, anxiety." His thought process was circumstantial and loose, but thought content was unremarkable. The claimant's attention and concentration were fair, but with circumstantial information throughout the exam. His insight was fair. The claimant was fully oriented. Memory testing showed his remote memory was intact, immediate recall was intact, but delayed recall was not intact. He struggled with delayed three item recall, serial three subtraction, and number repetition forward. The claimant struggled with serial seven subtraction and was not able to answer questions without adding unnecessary information. The claimant needed repeated interruptions to keep the interview on track.[117]

As with the other psychological examinations, the ALJ's impression of NP Ketchel's examination is accurate and contributes to the

---

[116] AR 1113–18.

[117] AR 31.

substantial evidence to find Plaintiff no more mentally limited than as provided in the RFC.[118] Based on Plaintiff's testimony, the normal and abnormal findings throughout the record, and the examination reports, the ALJ reasonably limited Plaintiff's RFC to simple tasks, simple work-related decisions, occasional changes in a routine work setting, occasional interactions with coworkers and the public, and no collaborative work.[119]

The ALJ also reasonably discounted the severity of Plaintiff's testimony based on the evidence of his daily activities. Plaintiff testified that he was completely disabled by pain and spent many days in bed, unable to move. However, as the ALJ noted, early in the at-issue period he reported staying active with mechanical work on his truck.[120] Later, he reported to his counselor sometimes taking care of his son without issue.[121] He often reported going fishing, having

---

[118] *See* AR 843–49.

[119] AR 25, 31.

[120] AR 887.

[121] *See, e.g.*, AR 1300, 1305.

hobbies involving his hands around the house, including mechanical work, and taking care of his dog.[122] As particularly convincing evidence to cast doubt on the severity of Plaintiff's activities testimony, as the ALJ noted, Plaintiff started living in a one-person cabin in June 2022, and he had to sign an agreement that his wife would not come on the property.[123] In November 2023, he reported to his therapist: "I am so thankful as I won't [lose] my housing because I love this house. I have really made it my own. It was also nice to know that I was a really clean tenant. I was the cleanest tenant they ever had."[124] He frequently reported to his therapist that he was satisfied with living alone.[125] Based on these reports, the ALJ rationally discounted Plaintiff's testimony that his pain made him dependent on others.

The ALJ did not, however, explicitly consider Plaintiff's testimony that he could complete his minimal daily activities only by taking

---

[122] *See, e.g.*, AR 1264, 1270, 1291, 1326, 1370.

[123] AR 992, 994, 1031.

[124] AR 1271.

[125] *See, e.g.*, AR 1224, 1229, 1291.

frequent breaks, and did not consider whether the need for breaks was transferrable to the work setting. This error is inconsequential. First, based on the ALJ's evaluation of Plaintiff's testimony and the conflicting evidence, the ALJ implicitly considered his asserted need to take breaks, and doubted the extent of breaks he said he needed because of the evidence of his abilities to live independently. Second, the substantial evidence discussed above supports the RFC without a need for excessive breaks, so the ALJ's failure to articulate his consideration of breaks did not impact the nondisability determination.

Finally, the ALJ reasonably relied on some evidence that Plaintiff sought treatment primarily to support his disability claim.[126] The ALJ noted two instances of such: (1) at a February 2023 therapy appointment, Plaintiff said his goal for treatment was "getting [his] SS disability";[127] and (2) in April 2023, Plaintiff established care with a new primary care provider, expressing "concern about disability as he is advised that he needs to be seen by PCP twice a month at

---

[126] *See* AR 31–32.

[127] AR 1215.

minimum."[128] These notes are relevant to Plaintiff's credibility and it was reasonable for the ALJ to consider them. The ALJ did not discount Plaintiff's testimony solely on this basis. At best, the ALJ gave it only minimal consideration; the ALJ's three-sentence discussion on the subject comes after he already explained the evidence for and against the RFC, and concludes a seven-page analysis dedicated entirely to the evidence for and against Plaintiff's testimony. So, Plaintiff's argument on appeal that the ALJ erred in this regard fails. Even if the ALJ did err, it was harmless, as the ALJ provided clear and convincing reasons supported by substantial evidence to discount Plaintiff's testimony without acknowledging his motivations.

**B. Medical Opinions: Plaintiff fails to establish consequential error.**

Plaintiff argues the ALJ improperly assessed the medical opinions of NP Nelson, Dr. Genthe, NP Ketchel, Dr. Billings, Ms. Burke, NP Washington, NP Gregg, Dr. Packer, and

---

[128] AR 1205.

Dr. Leinenbach. As discussed below, substantial evidence supports the ALJ's evaluation of the medical opinions.

1. Standard

The ALJ must consider and articulate how persuasive he found each medical opinion and prior administrative medical finding, including whether the medical opinion or finding was consistent with and supported by the record.[129] The factors for evaluating the persuasiveness of medical opinions include, but are not limited to, supportability, consistency, relationship with the claimant, and specialization.[130] Supportability and consistency are the most important factors.[131] When considering the ALJ's findings, the Court is constrained to the reasons and supporting explanation offered by the ALJ.[132]

---

[129] 20 C.F.R. §§ 404.1520c(a)–(c), 416.920c(a)–(c); *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

[130] 20 C.F.R. §§ 404.1520c(c)(1)–(5), 416.920c(c)(1)–(5).

[131] *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).

[132] *See Burrell*, 775 F.3d at 1138.

2. Treating Providers

*a. Rebecca Nelson, ARNP, and Johannah Gregg, ARNP*

Both NP Nelson and NP Gregg were primary care providers for Plaintiff. On October 13, 2021, NP Nelson performed a physical examination of Plaintiff.[133] NP Nelson diagnosed Plaintiff with memory deficits from a traumatic brain injury, left shoulder and left foot pathologies, and lower back pain.[134] NP Nelson opined that Plaintiff was severely limited in all basic work activities and could not meet the demands of sedentary work.[135] NP Nelson accompanied her report with a chart indicating limited ranges of motion in several joints.[136]

On August 8, 2023, NP Gregg performed a physical function evaluation of Plaintiff.[137] NP Gregg diagnosed Plaintiff with lumbar pain radiating down the leg, memory deficit, neck pain/cervical

---

[133] AR 1141–50.

[134] AR 1147.

[135] AR 1147–48.

[136] AR 1149–50.

[137] AR 1141–45.

degenerative change, history of methamphetamine use, and left foot injury.[138] NP Gregg opined that Plaintiff was severely limited in all basic work activities and could not meet the demands of sedentary work.[139] NP Gregg evaluated limited ranges of motion in several joints.[140] In an accompanying assessment, NP Gregg stated, "unsure if patient will [meet] abilities to complete sedentary work due to decline in mental capacity and physical abilities to remain sitting for 8 hours a day."[141]

The ALJ found NP Nelson's report did not contain a medical opinion, but rather provided a "statement regarding the claimant's residual functional capacity, using the Agency's programmatic terms about the functional exertional levels instead of descriptions about functional abilities and limitations," and thus was a statement on an

---

[138] AR 1142.

[139] AR 1142–43.

[140] AR 1144–45.

[141] AR 1254–55.

issue reserved to the Commissioner.[142] And the ALJ found that to the extent it could be considered a medical opinion, NP Gregg's opinion was not persuasive for the following reasons:

> To begin, it is equivocal ("unsure"). Again, the undersigned notes that a statement regarding the claimant's residual functional capacity, using the Agency's programmatic terms about the functional exertional levels instead of descriptions about functional abilities and limitations, is not a medical opinion but rather a statement on an issue reserved to the Commissioner. It is also not consistent with the record as a whole, including the claimant's normal strength in the lower extremities ([*See, e.g.*, AR 652–56]).[143]

Although the ALJ's evaluation of these opinions contained errors, the errors were harmless and substantial evidence supports the ALJ's overall finding that opined sedentary-work limitation was not supported by the medical record. First, the ALJ erred by finding that

---

[142] AR 35.

[143] AR 35. The ALJ cited NP Gregg's note that Plaintiff requested she fill out his disability forms, rather than the disability forms themselves on which NP Gregg provided her full opinion. *See* AR 35 (citing AR 1251–52). The substance of the ALJ's discussion indicates the ALJ considered NP Gregg's complete opinion.

NP Nelson's report did not meet the regulatory definition of a medical opinion, because by specifying certain basic work activities in which Plaintiff was severely limited due to his impairments, NP Nelson provided a medical opinion.[144] Second, the ALJ committed the same error with respect to NP Gregg's opinion, as NP Gregg opined as to how severely each specific diagnosis would affect Plaintiff's ability to perform one or more basic work-related activities.[145] Third, the ALJ erroneously cited an April 2021 treatment note from NP Nelson as evidence of NP Gregg's opinion being inconsistent with the overall record.[146] This record shows that NP Nelson's April 2021 physical exam revealed a limp, limited back range of motion, negative straight leg raise test, full strength on deep bend in his right knee, and the inability to test the left leg due to foot pain when weight bearing.[147]

---

[144] *See* 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).

[145] *See id.*

[146] *See* AR 35 (citing AR 652–56).

[147] AR 652–56.

However, these errors are harmless. Because NP Nelson provided her opinion on the same form as NP Gregg, and the two opinions are substantially similar,[148] the ALJ's reasons for discounting NP Gregg's opinion, therefore, would apply the same to NP Nelson's opinion. Second, the ALJ nevertheless considered NP Gregg's opinion as if it were a medical opinion, explaining how he considered the supportability and consistency of the opinion.[149] Third, the ALJ thoroughly and accurately discussed plenty of record evidence that was inconsistent with NP Gregg's opinion, so the erroneous reliance on the April 2021 treatment note is inconsequential.

Additionally, substantial evidence supports finding NP Nelson's and NP Gregg's opinions—which amounted to Plaintiff being unable to

---

[148] *Compare* AR 1146–50, *with* AR 1141–45.

[149] *See* AR 35. Citing *Woods*, 32 F.4th at 792, Plaintiff argues the ALJ reversibly failed to articulate his consideration of the supportability of NP Gregg's opinion. Plaintiff is incorrect because the ALJ explained the opinion was unsupported because it was equivocal and utilized the Agency's programmatic terms. *See* AR 35.

perform even sedentary work—inconsistent with the overall record. When addressing Plaintiff's testimony above, the Court discussed the evidence that the ALJ considered and was inconsistent with such a severe opinion. To briefly summarize some of the evidence inconsistent with a finding that Plaintiff could not even perform sedentary work: diagnostic musculoskeletal imaging did not support severe limitations;[150] he required no invasive procedures, long-term narcotic medication, or assistive devices;[151] several physical exam findings did not support severe limitations;[152] he declined to undergo physical therapy;[153] he could make a full fist and grasp objects at two consultative exams six months apart;[154] treating providers noted

---

[150] *See, e.g.*, AR 776, 1157–58, 1250, 1385–86.

[151] *See, e.g.*, AR 614, 1080, 1109, 1180, 1220, 1248, 1616–20.

[152] *See, e.g.*, 788, 794–95, 834–35, 1122–24, 1430.

[153] AR 1205, 1807.

[154] AR 835, 1123.

several normal findings on mental status exams;[155] and Plaintiff could live independently.[156]

*b.* *Alison Burke, LMHC*

In August 2023, Ms. Burke, Plaintiff's therapist, completed a mental source statement form.[157] On it, she opined that Plaintiff would have either moderate or marked limitations in all basic mental work activities, that Plaintiff met the criteria for a mental impairment in the Listing of Impairments, and that Plaintiff would likely miss four or more days of work each month.[158]

The ALJ found Ms. Burke's opinion not persuasive because it was not supported by her treatment notes, "which show the claimant regularly had normal mental status examination findings on exam, including unremarkable mood and affect, thought process, and

---

[155] *See, e.g.*, AR 597, 605, 608, 662, 680, 695, 728, 732, 779, 800, 874, 1037, 1254, 1258.

[156] *See* AR 1224, 1229, 1271, 1291.

[157] AR 1133–36.

[158] AR 1133–35.

orientation . . . ."[159] The ALJ also discounted Ms. Burke's opinion as provided on a check-box form with little to no explanation or discussion of objective findings.[160] The ALJ also found Ms. Burke's opinion "not consistent with the record as a whole, including records showing the claimant has been able to live alone, independently, and more often than not his mental status examination findings were grossly normal," referencing findings of normal thought content and process, grossly intact attention, average fund of knowledge, fair insight and judgment, normal behavior, adequate memory, appropriate eye contact, and fair concentration.[161]

Substantial evidence supports finding Ms. Burke's opinion not persuasive. Ms. Burke's therapy notes reflected Plaintiff's waxing and waning mood and stress, but not disturbances so severe to support Ms. Burke's opinion that Plaintiff could not meet any mental demands of

---

[159] AR 34.

[160] AR 34–35.

[161] AR 35.

work.[162] Ms. Burke's therapy notes also reflected Plaintiff successfully using coping skills and making improvements in his mood, independent living, hobbies, ability to take care of his son, and socializing.[163] Her opinion was also not consistent with several mental status exams throughout the relevant period that more often than not showed normal behavior, attention, memory, and judgment.[164]

3. Physical Examinations

*a. Derek Leinenbach, MD*

On December 28, 2022, Dr. Leinenbach performed a physical consultative examination of Plaintiff.[165] Dr. Leinenbach opined that Plaintiff could stand or walk for up to four hours in an eight-hour work day due to lumbar degenerative disc disease with bilateral sciatica, polyarthralgia, chronic left metatarsalgia, and leg length

---

[162] *See, e.g.*, AR 992, 1006, 1224, 1229, 1258, 1270, 1291, 1326, 1370.

[163] *See, e.g.*, AR 954, 970, 1006, 1084, 1270, 1291, 1305.

[164] *See, e.g.*, AR 597, 605, 608, 662, 680, 695, 728, 732, 779, 800, 874, 1037, 1254, 1258.

[165] AR 833–36.

discrepancy.[166] Dr. Leinenbach also opined that Plaintiff could lift or carry up to twenty pounds occasionally and ten pounds frequently; climb, crawl, crouch, and stoop occasionally; reach on his left side occasionally; and had no limitations in his right-sided reaching, handling/fingering/feeling, or sitting.[167]

The ALJ found Dr. Leinenbach's opinion not persuasive because it was not supported by his examination findings that Plaintiff had full motor strength in the bilateral upper and lower extremities and normal muscle bulk and tone throughout.[168] The ALJ also found the opinion not consistent with the record as a whole, which more often than not showed normal musculoskeletal findings.[169]

---

[166] AR 835–36.

[167] AR 836.

[168] AR 33.

[169] AR 33.

*b. Marquetta Washington, ARNP*

On January 3, 2023, NP Washington performed a physical examination of Plaintiff.[170] She opined that because of frequent spasms in Plaintiff's left arm, he could lift and carry only up to ten pounds occasionally; never bend or balance; occasionally handle, finger, and grip items; occasionally reach forward with the left arm but never overhead; and walk a total of two to four hours in an eight-hour workday.[171]

The ALJ found NP Washington's opinion not persuasive for the following reasons:

> To begin, it is not well supported by ARNP Washington's exam findings. For example, she opined the claimant could occasionally handle, finger, and grip. She stated this was because of muscle spasms in the left arm. However, on exam with Ms. Washington, the claimant had a normal exam of the hands, including full grip, dexterity, and sensation. Moreover, she noted that she expected the spasms in the claimant's left arm to last less than 12 months ([AR 1125]). Also, this opinion is not consistent with the record as a whole. Specifically, the record shows that the claimant's left arm spasming started in December 2022, after the claimant helped a friend unplug a toilet by using a plumbing snake

[170] AR 1120–26.

[171] AR 1125–26.

> ([AR 1177]). His provider assessed him with a muscle strain of the trapezius muscle ([*See, e.g.*, AR 1193]). In other words, Ms. Washington examined the claimant a month after he strained his left arm by using a plumbing snake; there is no evidence that this strain caused symptoms that lasted for a continuous 12-month-period.[172]

*c.* *Analysis*

The ALJ rationally found that Dr. Leinenbach's exam findings that Plaintiff had full motor strength in the bilateral upper and lower extremities, and normal muscle bulk and tone throughout, did not support limiting Plaintiff to only four hours of standing or walking in an eight-hour workday.[173] Other exam findings further underscore the ALJ's supportability finding regarding the stand/walk limitation: he

---

[172] AR 34.

[173] AR 33, 835. Plaintiff also challenges the ALJ supposedly not adopting Dr. Leinenbach's opinion that he could only occasionally reach with the left arm. Plaintiff is mistaken. Dr. Leinenbach opined that Plaintiff could occasionally left-side reach "above." AR 836. The ALJ agreed. *See* AR 25 ("The claimant can occasionally reach overhead, and frequently reach in all other directions.").

had no edema in the lower extremity; his gait was stable and reciprocated; he could stand on heels and toes; he could squat without assistance; he had normal range of motion in his hips, knees, and ankles; there were no joint deformities or knee instabilities; and both knees were tender to palpitation diffusely but otherwise unremarkable.[174]

Substantial evidence also supports finding NP Washington's opinion not well supported. Her opinions were based only on "frequent spa[s]ms in left arm."[175] Plaintiff first complained of spasms on December 30, 2022, persisting since a trapezius strain two weeks prior.[176] NP Washington saw Plaintiff on January 3, 2023.[177] Therefore, without evidence of long-term spasms, the ALJ reasonably found that NP Washington's opinion was unpersuasively supported only by the fleeting presentation of an acute minor injury. Moreover, the RFC did

---

[174] AR 834–35.

[175] AR 1125–26.

[176] *See* AR 1177, 1193.

[177] AR 1120.

limit Plaintiff to occasional overhead reaching and frequent reaching otherwise.[178]

4. Physical Medical Review

On October 22, 2021, Dr. Packer reviewed the medical records in Plaintiff's Department of Social & Health Services file.[179] Dr. Packer opined that Plaintiff could not stand or walk for brief periods at work and had marked limitations in his abilities to maintain regular attendance and work around hazards.[180]

The ALJ found Dr. Packer's opinion not persuasive because although it was supported by Plaintiff's October 2021 emergency department visit when his blood glucose level was over 600, it was not consistent with the record as a whole because Plaintiff did not have any hospitalizations for blood sugar after that visit and the record contained overall normal musculoskeletal and neurologic findings.[181]

---

[178] AR 25.

[179] AR 1593–94.

[180] AR 1593.

[181] AR 35–36.

Substantial evidence supports finding Dr. Packer's opinion not persuasive. Although Dr. Packer's opinion was supported by Plaintiff's then-recent hospitalization for severely elevated blood sugar, it was not consistent with the overall record containing no evidence of further severe diabetic episodes.

5. Psychological Evaluations

*a. Thomas Genthe, PhD*

On October 25, 2021, Dr. Genthe performed a psychological evaluation of Plaintiff.[182] Dr. Genthe diagnosed Plaintiff with major depressive disorder, anxious distress, post-traumatic stress disorder, and attention-deficit/hyperactivity disorder.[183] Dr. Genthe opined that Plaintiff had marked limitations in his ability to understand, remember, and persist in tasks by following detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual; learn new tasks; make simple work-related decisions; communicate and perform effectively in a work setting; maintain

---

[182] AR 1166–73.

[183] AR 1169.

appropriate behavior in a work setting; and complete a normal work day and work week without interruptions from psychological symptoms.[184] Dr. Genthe opined Plaintiff had moderate limitations in his ability to perform routine tasks without special supervision; be aware of normal hazards and take appropriate precautions; ask simple questions or request assistance; and set realistic goals and plan independently.[185] Dr. Genthe rated Plaintiff as overall markedly impaired by his mental impairments.[186] He explained that Plaintiff's symptoms "are likely to interfere with his ability to initiate or maintain future employment," and Plaintiff "is unlikely to function adequately, and/or consistently in a work setting."[187]

The ALJ found Dr. Genthe's opinion not persuasive, explaining "it is not well supported in that it is highly equivocal ('likely' and 'unlikely'). It is also vague, in that it is not a function-by-function

---

[184] AR 1169–70.

[185] AR 1169–70.

[186] AR 1170.

[187] AR 1170.

analysis of the claimant's maximum mental functional ability."[188] The ALJ explained Dr. Genthe's opinion was also not consistent with the record as a whole, "including records showing the claimant has been able to live alone, independently, and more often than not his mental status examination findings were grossly normal . . . ."[189]

*b. Emma Joan Billings, PhD*

On June 16, 2022, Dr. Billings performed an intellectual psychological assessment of Plaintiff.[190] She opined that Plaintiff was able to learn new information with frequent repetition and explanations, and would likely have difficulties maintaining employment with the continued use of substances.[191] She attached a WAIS-IV test result chart indicating Plaintiff had a full-scale IQ of 84, which was in the "low average" range.[192]

---

[188] AR 35.

[189] AR 35.

[190] AR 843–49.

[191] AR 848.

[192] AR 849.

The ALJ found Dr. Billings' opinion not persuasive because it was not supported by her examination findings, referencing Plaintiff's low-average IQ score.[193] The ALJ also found the opinion "not consistent with the record as a whole, which shows the claimant had an average fund of knowledge and adequate memory, even during periods when actively using substances . . . ."[194]

*c.* *Emily Ketchel, PMHNP*

On December 28, 2022, NP Ketchel performed a psychiatric consultative examination of Plaintiff.[195] She opined that Plaintiff was not able to understand, remember, and carry out simple or complex instructions; sustain concentration and persist in work-related activity at a reasonable pace, including regular attendance at work and completing work without interruption; interact with others; or adapt to the usual stresses encountered in the workplace.[196]

---

[193] AR 34.

[194] AR 34.

[195] AR 1113–18.

[196] AR 1118.

The ALJ found NP Ketchel's opinion not persuasive because it was not supported by her examination findings, referencing Plaintiff's ability to perform a three-step command and perform number repetition backwards.[197] The ALJ also found the opinion not consistent with the record as a whole, referencing Plaintiff's prior WAIS-IV testing and records showing Plaintiff's behavior was "calm, cooperative, and normal more often than not."[198]

*d.* *Analysis*

Substantial evidence supports the ALJ finding the opinions of Dr. Genthe, Dr. Billings, and NP Ketchel unpersuasive. Mental status exams more often than not showed normal behavior, attention, memory, and judgment.[199] Records of his two emergency department visits for mental health did not support severe memory or thought-

---

[197] AR 34.

[198] AR 34.

[199] *See, e.g.*, AR 597, 605, 608, 662, 680, 695, 728, 732, 779, 800, 874, 1037, 1254, 1258.

processing limitations.[200] He could live independently, keep up with hobbies, sometimes take care of his son, and socialize with friends and family.[201] The ALJ therefore reasonably concluded that the mental-health opinions more limiting than the RFC were inconsistent with the overall record. The ALJ rationally limited Plaintiff's mental RFC to simple instructions, simple decisions, occasional changes, occasional interactions, and no collaboration.

Based on the substantial evidence supporting the ALJ's overall treatment of Dr. Genthe's opinion, the ALJ's error when discounting Dr. Genthe's opinion as "highly equivocal" and vague without a function-by-function assessment was harmless.[202] Contrary to the ALJ's finding otherwise, Dr. Genthe did provide a mental function-by-function assessment.[203] And his concluding notes that Plaintiff's

---

[200] *See* AR 1183–87, 1413–26.

[201] *See* AR 887, 992, 994, 1031, 1264, 1270, 1291, 1300, 1305, 1326, 1370.

[202] *See* AR 35.

[203] AR 1169–70.

symptoms "are likely to interfere with his ability to initiate or maintain future employment," and Plaintiff "is unlikely to function adequately, and/or consistently in a work setting" are not too vague to render Dr. Genthe's opinion completely unsupported when considered along with Dr. Genthe's entire report.[204] Nonetheless, as is set forth above, substantial evidence supports the ALJ's finding that Dr. Genthe's opined limitations are not supported by the noted observations in the treatment record.

On this record, the ALJ appropriately considered the supportability and consistency of each challenged medical opinion and substantial evidence supports the ALJ's weighing of the medical opinions.

## IV. Conclusion

Plaintiff fails to establish that the ALJ consequentially erred. The ALJ's nondisability findings are supported by explanation and substantial evidence.

[204] *See* AR 1168–70.

Accordingly, **IT IS HEREBY ORDERED**:

1. The ALJ's nondisability decision is **AFFIRMED**.

2. The Clerk's Office shall **TERM** the parties' briefs, **ECF Nos. 8 and 12**, enter **JUDGMENT** in favor of the **Commissioner**, and **CLOSE** the case.

IT IS SO ORDERED. The Clerk's Office is directed to file this order and provide copies to all counsel.

DATED this 2nd day of September 2026.

EDWARD F. SHEA
Senior United States District Judge